IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL HAVINS,
     Plaintiff,

vs.

FMC TECHNOLOGIES, INC. d/b/a
TECHNIPFMC,
     Defendant.

§
§
§
§
§
§
§
§
§

Civil Action No. 4:19-cv-00070

JURY TRIAL DEMANDED

## MICHAEL HAVINS' RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Preliminary Statement ............................................................................................................. 1

Facts ........................................................................................................................................ 2

    A.    Trent Havins Worked for TechnipFMC. ............................................................. 2

    B.    Defendant Claimed It Terminated Havins In a Reduction in Force Because He Finished Last on a 'Measured Evaluation' of Personnel, Also Known as "the Critical Skills Assessment." ........................................................................................ 3

    C.    Defendant Terminates Plaintiff and Promptly Fill His Position With A Series of Younger Employees. ........................................................................................ 4

    D.    FMC Selected Havins for Firing First and Only Then Started Preparing the Critical Skills Assessment. ........................................................................................ 5

    E.    After Plaintiff Pointed Out This Discrepancy at Klingensmith's Deposition, FMC Began Changing Its Story. ........................................................................................ 6

    F.    Other Evidence Suggests The Termination Decision Was Made Even Earlier. ...... 8

    G.    Robert White Had No Substantive Role in the Process and Says Havins Was Fired Only Because of His Age. ........................................................................................ 9

    H.    FMC Tried to Keep White From Testifying. ....................................................... 11

    I.    Janet Lee Had No Involvement In Preparing the Critical Skills Assessment and, In Fact, Thinks Havins Was Doing a Fine Job and Was Excited to Have Him on Her Team. ........................................................................................ 12

Summary of Argument ........................................................................................ 13

Argument ........................................................................................ 13

    A.    Standard of Review. ........................................................................................ 13

    B.    The Excuse Asserted in Defendant's Summary Judgment Motion Conflicts With Its Prior Assertions. ........................................................................................ 15

    C.    No Critical Skills Assessment Was Actually Performed. ....................................... 19

    D.    Klingensmith Is an "Interested Witness," Her Credibility is in Tatters, and a Reasonable Factfinder Could Disbelieve Everything She Has to Say ................. 20

    E.    Defendant's Numerous Lies May Be Taken as Affirmative Evidence of Guilt. ... 20

    F.    Robert White Says Havins Was Fired Because of His Age. ................................. 23

    G.    *McMichael* is Distinguishable. ........................................................................................ 23

Conclusion ........................................................................................ 25

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Michael Havins, suing for age discrimination under the ADEA and TCHRA, now responds to Defendant FMC Technologies, Inc.'s motion for summary judgment. The motion should be denied.

## PRELIMINARY STATEMENT

Rule 56 exists only "to isolate and dispose of *factually unsupported* claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) (italics added). It is not, by contrast, a lottery wheel for defendants to spin in every case, hoping the plaintiff will fail to present evidence the defendant knows exists. So when a party knows about factual disputes and files a motion anyway "[it] defeats that purpose; and, more importantly, violates the rules of procedure which govern the conduct of trial, specifically Rule 11." *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1998).

This is such a case. Defendant knows that questions of fact abound here, yet insists on spinning the wheel anyway. It knows it told the EEOC it terminated Havins because it performed a so-called 'critical skills assessment' and Havins finished last; but documentary evidence reveals that Defendant did not even begin preparing this assessment until one day *after* HR's Noreen Klingensmith told a group of managers that Havins would be getting the axe. It knows it changed its story mid-litigation after Plaintiff noted this glaring discrepancy, now claiming the termination was actually based a different document – not the one it attached to its EEOC position statement. It knows its EEOC excuse does not accord with its interrogatory answers, which are in turn disputed by the deposition testimony. It knows that FMC claimed to have considered numerous specific criteria that witnesses say was never considered. It knows it claimed to have considered length of employment, though FMC preferred (and retained) nearly two dozen younger and less-tenured employees.

1

It knows it claimed Robert White conducted the critical skills assessment but that White says he had nothing to do with it. It knows it says that Janet Lee prepared the RIF documentation (which contains and references the critical skills assessment), but Lee swears she did not. It knows that Klingensmith admits having forged Lee's name on that document, indicating approval where none had been given. It knows that Robert White – the most senior manager it claimed participated in the firing decision – testified that he was but a bystander, that Klingensmith dictated the decision, *and that Havins was in fact fired because of his age*. FMC knew – but failed to disclose until the morning of White's deposition – that White not only had filed his own age discrimination charge against the company, but that his charge literally devoted an entire paragraph to Havins' firing!

In short, FMC is well-versed in the many facts undercutting its asserted summary judgment grounds. Defendant's motion perverts Rule 56. It should not have been filed. The Court should deny it.

## FACTS

### A.      Trent Havins Worked for TechnipFMC.

Trent Havins worked for FMC for nearly six years, performing several different jobs. Exhibit 1, Deposition of Michael Havins ("Havins Depo."), pp. 64-65, 97, 106; Exhibit 21 ("Offer Letters"). At the time of his termination, he was a Project Planner III reporting directly to Janet Lee, the Manager of Material Planning. Exhibit 2, FMC Technologies RIF Process Forms ("RIF Packet"), Form 2; Exhibit 3, Deposition of Casey Pickard ("Pickard Depo."), p. 36. Havins worked within FMC's Subsea Services Africa North America ("SSANA") business unit.[1] As a Project Planner III, Havins supported the international team. Exhibit 4, Deposition of

---

[1] Subsea services is one of FMC's four global business units. SSANA is a business unit within Subsea Services. Exhibit 3, Pickard Depo., pp. 10, 16-17.

Robert White, Volume I ("White Depo."), p. 79-80. Robert White, manager of the planning and delivery unit, oversaw six teams, including Lee's. *Id.* at 46-47, 133. Havins had been assigned to Lee's team just a few months before his firing. Exhibit 5, Deposition of Janet Lee ("Lee Depo."), p. 137. During the last year of his employment, Havins was bounced from manager to manager and team to team. Havins Depo., pp. 144, 146-48. Over his last year with Defendant, Havins reported to no fewer than five managers. *Id.*

**B.** **Defendant Claimed It Terminated Havins In a Reduction in Force Because He Finished Last on a 'Measured Evaluation' of Personnel, Also Known as "the Critical Skills Assessment."**

FMC says that in late September or early October 2017 it had decided to implement a reduction in force. Exhibit 6, Deposition of Noreen Klingensmith ("Klingensmith Depo."), p. 70. And its excuse for selecting Havins for termination – the one it claimed to the EEOC, that is – could not have been clearer. As FMC told the EEOC 2 ½ years ago, it chose Havins "through a measured evaluation (criteria of experience, potential, tenure, and performance) of its team members. The team member with the lowest ranked score was selected for the RIF." Exhibit 8 ("Position Statement"), p. 2. It pointed the EEOC to its "Measured Evaluation Chart (with rankings)", attached as Exhibit D to the Position Statement. That attachment to the Position Statement is substantively identical to the "Critical Skills Assessment" document included as Form 4 in its RIF Packet.[2] Compare Exhibit 8, p. 16 and Exhibit 2, Form 4. Throughout discovery – at least until earlier this year – Defendant referred consistently to this document as the "Critical Skills Assessment." Exhibit 7, Defendant's Answers to Initial Protocol's Information Requests ("Initial Protocols"), p. 3; Exhibit 9, Defendant's Answers to Plaintiff's First Set of Interrogatories ("Interrogatory Answers"), No. 6, 11. According to Defendant, the

_____

[2]The only difference is that the EEOC submission included a column labeled "Job Title" and the document in the RIF Packet did not.

low-scorer on the Critical Skills Assessment was to be terminated. Pickard Depo, pp. 99 and 104-105; Exhibit 8, p. 2; Interrogatory Answers, No. 6, 11. FMC says Havins was the low scorer and, thus, was fired.

### C. Defendant Terminates Plaintiff and Promptly Fill His Position With A Series of Younger Employees.

On October 18, 2017, Havins was summoned to a meeting with Lee, White, and Klingensmith. Klingensmith Depo., p. 311; Exhibit 10, Deposition of Robert White, Volume II ("White Depo. II"), p. 17. They told Havins he was fired, effective immediately, claiming they were eliminating his position.[3] Havins Depo., pp. 168, 215. Exhibit 11, p. 1. At 54 years old, Havins was the oldest employee in his department and the only one in White's unit to be terminated. Havins Depo, p. 188; RIF Packet, Forms 6, 6a.

As for the 'position elimination' excuse itself, it was not remotely true. Just a few hours after firing Havins, Defendant announced that Brian Hoffman (29 years old) would be absorbing his tasks. Havins Depo., pp. 190-91; White Depo., pp. 116-17; Position Statement at 2. Defendant admits this, saying that Hoffman – 25 years Havins' junior – was being underutilized when it fired Havins. Position Statement at 2; Klingensmith Depo., p. 76. Yet just days earlier Lee had assigned Havins, not the supposedly-underutilized Hoffman, to a critical project for an important international client. Lee Depo., pp. 110-11. This project was a top priority for the company from a financial perspective. *Id.* Then, less than two weeks later, Defendant filled the position by moving 27-year-old Eric Gravina to Lee's team as a Project Planner, the same position Havins held.[4] Position Statement at 2; Exhibit 12; White Depo. II, p. 106. *Compare* RIF

---

[3]In December 2017, FMC terminated Lee, allegedly as part of a RIF. White Depo., p. 61. Greg Mikolas, White's manager at the time, said her position was being eliminated. Exhibit 13, White EEOC Charge of Discrimination ("White Charge"), ¶¶ VII, VIII. However, just like with Havins' position, Lee's position was not eliminated. White Depo., p. 61-62. White was demoted and assumed Lee's role. *Id.*

[4]Gravina was previously a Project Manager not in White's unit. RIF Packet, Form 2(a) (see Miller's team).

Packet, Form 2(a) (composition of Lee's team before the October RIF) with Form 2(b) (composition of Lee's team after the October RIF).[5] Meanwhile, FMC was actively hiring for other positions within the Operations Department (including on the international team) that required assistance and support from Havins' planner position. Havins Depo., pp. 168-71; White Depo., pp. 116-17; Exhibit 22.

FMC later changed its story to claim that Havins was fired because he was the lowest-ranked employee in the entire group (more on this, below). If these alleged performance concerns were real – if Havins was really the worst-performing planner – then he would have been the last one assigned by Lee to perform critical tasks. He would have been the one being sidelined and underutilized. But instead, FMC assigned Havins critical work, then fired him, and then replaced him, first with an underused worker in his 20's and later with a younger person transferred in from outside the group.

### D. FMC Selected Havins for Firing First and Only Then Started Preparing the Critical Skills Assessment.

Defendant convened a meeting on October 10, 2017, attended by Klingensmith, White, and White's direct reports. Klingensmith Depo., pp. 165-66; White Depo. II, p. 13. Defendant says that this meeting included a collective discussion about all the employees and their rankings and individual scores on the Critical Skills Assessment. Document Entry No. 45, pp. 8 and 23.; Klingensmith Depo., p. 135. Klingensmith says White led the meeting. Klingensmith Depo., p. 166. White, by contrast, says this is "totally inaccurate" and that Klingensmith was running the show. White Depo. II, p. 15. In fact, White characterizes her as making the decisions for management, instead of simply supporting the planning organization's needs (as her role called for). *Id.* at 91. White explains that Klingensmith scheduled the meeting with White and his

---

[5]Havins is still listed as a member of Lee's team on Form 2(b), but clearly that cannot be the case. RIF Packet, Form 2(b).

direct reports, waltzed into it, projected an already-completed ranking spreadsheet listing Havins dead last, and outright declared that Havins would be the unlucky employee slated for termination.[6] *Id.* at 104-05; Lee Depo., pp. 82, 151; Klingensmith Depo., p. 275. Both White and Lee have also testified that any scoring and ranking of employees occurred without their input, and that neither they nor any of White's other direct reports filled out any portion of any spreadsheet scoring or ranking employees. White Depo., pp. 124, 127-28; White Depo. II, pp. 108-109; Lee Depo., pp. 74-75, 78, 97.

The next day, on October 11, Klingensmith emailed Reagan McGee, also in Human Resources, telling her to "***start*** the CSA [Critical Skills Assessment] and demo [demographics] etc." Exhibit 14, October 11, 2017 email ("McGee Email") (italics added). In the same email, she told McGee that Havins was the one to be fired. *Id.*

This alone establishes pretext. FMC told the EEOC it "performed" a critical skills assessment, then picked the person who finished last. The McGee Email, though, shows that FMC picked Havins first and only then started preparing the Critical Skills Assessment. One simply does not "start the CSA" if the CSA has already been completed. Viewed in the light most favorable to Havins, in other words, the decision drove the assessment, not the other way around. How could FMC's excuse possibly be true given this chronology of events? Defendant knows about these facts. How can it reasonably propose that no fact question exists regarding the truthfulness of its excuse? *Goka*, 862 F.2d at 650.

### E. After Plaintiff Pointed Out This Discrepancy at Klingensmith's Deposition, FMC Began Changing Its Story.

Up until Klingensmith's deposition, Defendant was adamant about its excuse – it

---

[6]Defendant claims that at the meeting, Klingensmith projected what it refers to as the "Top Grading Spreadsheet". Docket Entry No. 45, p. 8; Klingensmith Depo., p. 167; Exhibit 17. However, Lee swears that the document projected contained only three or four columns (more similar to Form 5 of the RIF Packet – Summary of Employees Assessed on the Critical Skills). Lee Depo., pp. 69, 82.

performed a Critical Skills Assessment; that assessment revealed Havins as the lowest-ranked; and it therefore cut Havins. This is what it told the EEOC, asserted in its Responses to the Court's Initial Discovery Protocols for Employment Cases (Exhibit 7), and claimed under oath in its Interrogatory Answers. Before Klingensmith's deposition, Defendant had never even identified Reagan McGee as having any role whatsoever in the termination. But then Havins' counsel showed Klingensmith the McGee Email and everything changed.

After the deposition, FMC amended its Interrogatory Answers to list McGee for the first time as a witness who had "transposed the spreadsheet data", as if to suggest that McGee was not tasked with what the McGee Email plainly told her to do ("start the CSA"), and she instead was just transposing someone else's information from some other format. Exhibit 15, Defendant's Amended Answers to Plaintiff's First Set of Interrogatories ("Defendant's Amended Interrogatories"), No. 4. But Havins anticipated this dodge, which is why his counsel asked Klingensmith whether anything like that had occurred. Klingensmith said it had not, i.e., that McGee did not at any time "take any information from one source and populate, for example, the RIF packet in any respect." Klingensmith Depo., p. 24.

Defendant's very excuse has changed. Before Klingensmith was shown the McGee Email, the decision was entirely 'we performed a critical assessment and Havins finished last.' But now, as the Court can tell from the summary judgment motion, it has craftily changed that to "[the] employee with the lowest ranked critical skills assessment Top Grade Score was selected for layoff." Docket Entry No. 45, p. 15. The change is subtle but crucial; there is no such thing as a "critical skills assessment Top Grad Score". Mid-litigation, FMC changed the nomenclature in its excuse so that it could point to the Top Grade scoring process, which is an entirely different employee evaluation process that it administers semi-annually. Its motion repeatedly points to Havins' poor performance on the most recent Top Grade Spreadsheet to bolster its justification

for selecting Havins. But Klingensmith testified that the Top Grade Spreadsheet – the product of a semi-annual Top Grading exercise done by management – and Critical Skills Assessment are not the same and are, in fact, two distinct items.[7] Klingensmith Depo., pp. 146-47. And testifying as FMC's corporate representative she could not have been clearer that the Critical Skills Assessment and only that document that caused Havins' selection:

> Q. Any other reasons that the company contends FMC ended Mr. Havins' employment for nondiscriminatory reasons unrelated to his age?
> A. Are there anything – is there anything else?
> Q. Uh-huh.
> A. No. The CSA.

Klingensmith Depo., pp. 110-11. In other words, notwithstanding Defendant's *post hoc* effort to conflate an earlier Top Grade Spreadsheet into the excuse it had been touting since the March 2018 Position Statement, the record still must be viewed in the light most favorable to Havins. This summary judgment record establishes that FMC insisted for years that the decision was purely Critical Skills Assessment-driven; that the decision was made (by Klingensmith, not by management) on October 10; and that Klingensmith would not even tell McGee to even "start the CSA" until one October 11. It simply cannot be true that Havins was selected on October 10 because of a Critical Skills Assessment that HR would not even "start" until October 11.

### F. Other Evidence Suggests The Termination Decision Was Made Even Earlier.

We know from the record that Klingensmith dictated to the assembled managers on October 10 that Havins would be fired, and that a reasonable factfinder could therefore conclude that the decision dictated the Skills Analysis and not the other way around. But other evidence actually suggests that Havins was picked even before that.

---

[7]Both practices involve *different* spreadsheets, serve different purposes and rank different categories. Klingensmith Depo., pp 94-95, 146-47. Among other differences, the Top Grading Spreadsheet included consideration of an employee's "Relevant Experience" and "Years of Service", items that appear nowhere in the Critical Skills Assessment (including "FMC Years of Service") Compare Exhibits 17 and 2, Form 4.

On October 4, 2017, a full week before the McGee Email, Pickard emailed a Powerpoint presentation called "Delivery Planning" to Vicki Jackman and Joakim Langkaas. Jackman was Klingensmith's boss. Klingensmith Depo., p. 21. Langkaass was the financial controller. Pickard Depo., p. 60. This Powerpoint identified, by manager, the employees in White's unit. Exhibit 16. Havins appears nowhere in this Powerpoint – not on Lee's team or anywhere else. *Id.* Yet both Gravina and Andrew Baker (neither of whom at the time even worked in the planning department at the time) do appear in it. *Id.* at FMC 532, 533, 535; White Depo., pp. 146-47.[8] In other words, Havins had already been written out of the department almost a week before the October 10 meeting which, according to FMC's own version of events, is when management supposedly did an arms-length ranking of all the employees and identified Havins as the odd man out. A reasonable factfinder could thus conclude that Klingensmith and her boss had already known for at least a week that they would be getting rid of Havins, and the entire excuse presented by FMC is just deliberate obfuscation designed to hide that fact.

### G. Robert White Had No Substantive Role in the Process and Says Havins Was Fired Only Because of His Age.

Continuing with its fiction about the Critical Skills Assessment driving the decision, Defendant claims that White performed, conducted, and compiled the information that went into it. RIF Packet, Form 1; Interrogatory Answers, No. 11; Initial Protocols at 3; Pickard Depo., p. 79. Defendant also asserts that White made the decision about how many people to reduce in the delivery and planning department. Pickard Depo., p. 73. It also claims HR leadership, Pickard, and his direct reports (including White) determined the weighting for each category measured on

---

[8]Before Havins' termination, Gravina and Baker were both Project Managers on Josh Miller's asset and rental team. RIF Packet, Form 2(a). White thought it was odd that Miller's team was included in the same scoring and ranking exercise alongside his planning unit. White Depo., pp. 146-47. Project Managers were never part of the planning and scheduling organization and nor did they perform the same function as the planning organization. *Id.*

the assessment. Klingensmith Depo., p. 236.[9] Finally, it insinuated that White drafted Havins' severance letter. Exhibit 11.

White, by contrast, says that every bit of this is untrue. He neither performed nor administered nor participated in the Critical Skills Assessment in any way. White Depo., pp. 136-37. He played no role in it and, in fact, did not even know that it existed. *Id.* at 136, 159-60. While physically present at the October 10 meeting, he testified that the rating and ranking of employees on the Critical Skills Assessment and decision to terminate Havins "definitely did not involve me or my management team." White Depo. II, p. 91. White participated in no meeting to discuss the need for or reasoning behind the October RIF or how many were to be reduced. White Depo., p. 152. Like Lee (discussed in Section I below), until the day of his deposition White knew nothing about FMC's fictitious claims of his involvement in the Critical Skills Assessment. *Id.* at 138. Nor did White draft Havins' severance letter, as the letter indicates. White Depo. II, pp. 19-20; Exhibit 11; Klingensmith Depo., p. 311.

Not only that, but White himself asserts that Havins was fired because of his age:

Q. (By Ms. Wolf) Do you think age played a role in Mr. Havins' termination?
A. Yes.
Q. Do you think Mr. Havins was terminated because of his age?
A. Yes.

White Depo. II, p. 80. He testified that "because of his age I believe that he was placed at the bottom and replaced by someone younger . . . . He was replaced by a younger employee and he was over 54." *Id.* at 106. He testified explicitly that "Noreen preferred the younger engineering team", that the corporate restructures regularly favored the "younger engineers", and that whenever he or Janet Lee "or any old person had something to say Noreen questioned it, disrespected it, did what she wanted to do, and went to Casey Pickard who was younger as well

---

[9]Pickard says he had nothing to do with the weighting. Pickard Depo., p. 90.

and other people made decisions for the organization." *Id.* at 116. He ultimately says that Havins was fired because of his age and no other reason.[10] *Id.* at 79-80 and 100.

### H. FMC Tried to Keep White From Testifying.

As the Court may recall from an earlier hearing, FMC tried for months to keep Havins from deposing White, claiming that he was out on medical leave. Docket Entry No. 31. This went on for the better part of six months. But when he finally appeared for deposition in January of this year, White testified that while he had taken a short medical leave in May through July 2019, he had been generally available for deposition since July 2019. White Depo., p. 99.

So why didn't FMC want Havins to hear what White had to say? First is the obvious – his testimony stands in stark contrast to FMC's assertions about how Havins came to be terminated. But beyond that, it turns out that White also was discriminated against because of his age. White Depo., pp. 22-25. Near the start of his short medical leave last year – the one that FMC kept telling the undersigned rendered him unavailable for nearly six months after it ended – he filed his own EEOC charge. *Id.* at 25. White's deposition ended up occurring in two different sessions, and it was not until the morning of the second session that FMC finally produced a copy of White's EEOC charge. And, incredibly, White devoted an entire paragraph of his charge to the Havins termination as bolstering his own age complaint:

> In October 2017, there was an initiative to reduce more employees. Completely disregarding my role, Noreen called all of my managers and myself into a conference room and performed a top grading that place Michael Havins (White 50+ male) at the bottom of the ranking; [sic] resulting in his dismissal. Noreen's practices were unethically biased. At that moment, it was clear that Noreen had no respect for me. Noreen questioned my every move as the manager and undermined my authority on several issues. She would override my decisions; [sic] as well as requiring additional approvals from our Director. I didn't question her or the HR director out of fear of retaliation. I had been watching her moves

---

[10]After learning that Havins filed a lawsuit, Ms. Lee's first thought was that it was about age discrimination. Lee Depo., p. 21.

all along. They were bold and powerful; and no one reprimanded her for her actions.

White EEOC Charge, p. 3. It is no wonder FMC tried to keep Havins from deposing him.

### I.  Janet Lee Had No Involvement In Preparing the Critical Skills Assessment and, In Fact, Thinks Havins Was Doing a Fine Job and Was Excited to Have Him on Her Team.

Defendant says Lee prepared the RIF Packet used in Havins' termination, scored Havins, and input his scores on the Top Grade spreadsheet. Defendant's Interrogatory, No. 4; RIF Packet, Form 6; Pickard Depo., pp. 56, 58.[11] Just like White, Lee participated in none of this.

The truth is, Lee had no involvement in the RIF that resulted in Havins' termination, other than attending the October 10 meeting and the ensuing meeting on October 18. Lee Depo., p. 75. Lee played no part in the preparation, creation, or existence of the RIF Packet and, in fact, never saw it or its contents before her deposition. *Id*. at 76, 79, and 90. She also had no involvement in the scoring or ranking of employees on the ratings and rankings spreadsheet used to justify Havins' termination. *Id.* at 76, 79, 97-99, and 149; White Depo. II, pp. 91, 108-109. In fact, Lee was "excited" and "elated" when Havins was transferred to her team.[12] Lee Depo., p. 142. She never had any issues with him and thought he was doing a fine job. *Id.* at pp. 142-144. In other words, the idea that Havins scored poorly on a Critical Skills Analysis – assuming that one was actually ever performed by someone with knowledge of the employees' skills and performance – is contradicted by feedback from Havins' immediate and next-level supervisors.

FMC *knowingly* lied about Lee's involvement in the RIF process. Klingensmith admitted putting Lee's name in the "prepared by" signature block of the RIF Packet without Lee's consent or knowledge. Klingensmith Depo., pp. 181-83. FMC admitted to lying in its discovery

---

[11]The RIF Packet consisted of a compilation of eight different forms relating to the layoff, including a business summary, organization chart, the Critical Skills Assessment, and others. Exhibit 2.

[12]The project team and international project team also voiced positive feedback about Havins' performance. White Depo. II, pp. 30-31.

responses about Lee's role in the RIF. *Id.* at 180-183. Perhaps even more disturbing, FMC admitted to using this tactic generally, across the board in its RIFs. *Id. at* 182. FMC apparently considers it a "best practice" to knowingly misrepresent material facts about the RIFs it conducts. *Id.*

## SUMMARY OF ARGUMENT

FMC concedes that Havins can make a prima facie case of age discrimination. The sole issue presented by its motion, then, is whether Havins can demonstrate a triable issue of material fact as to the truthfulness of its excuse. The record is filled with fundamental factual inconsistencies, including shifting explanations, numerous fundamental false statements, and proof that the decision drove the Critical Skills Assessment, not the other way around. Taken as a whole, there is overwhelming evidence of pretext, not to mention strong suspicion of mendacity. This Court's role is not to resolve credibility issues or to decide who will win. Defendant's entire excuse is based on assertions from a biased witness who has lied repeatedly. There can be no judgment as a matter of law on a record such as this. The Motion should be denied.

## ARGUMENT

### A.      Standard of Review.

In a discrimination case involving circumstantial evidence the courts test the sufficiency of Plaintiff's case with the burden-shifting analysis first articulated in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under this scheme, the Plaintiff must usually adduce evidence of a *prima facie* case, after which the burden shifts to the employer to present evidence of a legitimate, non-discriminatory reason for the challenged employment practice. If the employer meets this simple burden of production (but not persuasion), the burden shifts back to the plaintiff to demonstrate that the excuse is pretextual. *Reeves v. Sanderson Plumbing Products,*

*Inc.*, 530 U.S. 133, 147 (2000).  A plaintiff can establish pretext by showing that the employer's proffered explanation is false or "unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Evidence demonstrating pretext, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2003). As *Reeves* explained, that proof of pretext entitles the Plaintiff to a trial because the jury may reasonably infer from the employer's lies that it is covering up its discriminatory conduct. *Reeves*, 530 U.S. at 147.

For the employer to satisfy its burden of production it must "clearly set forth, through the introduction of admissible evidence, the reasons for" its conduct. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55.  "An articulation not admitted into evidence will not suffice", so "the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Id.* at 255 n. 9.  If the employer, as here, does not challenge the *prima facie* case and instead simply offers an excuse, then the sole question is whether its excuse is pretextual.  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008) (Kavanaugh, J.); *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 443 (5th Cir. 2000) (summary judgment may be sustained only on grounds the movant actually asserted).

Finally, when considering a summary judgment motion the Court must review the record as a whole, disregarding all evidence favorable to the employer that the jury is not required to believe, draw all reasonable inferences in favor of Havins, and refrain from making credibility determinations or weighing the evidence.  *Reeves*, 530 U.S. at 150-51.[13]

---

[13]In other words, as a matter of law the Court cannot credit testimony coming from an interested witness like Klingensmith.

**B.      The Excuse Asserted in Defendant's Summary Judgment Motion Conflicts With Its Prior Assertions.**

An employer's rationale for the adverse employment action is "suspect" where it changes between the EEOC investigation and ultimate litigation. *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 237 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven Up Bottling Group., Inc.*, 482 F.3d 408, 415 (5th Cir. 2007)). As a matter of law and common sense, a purported reason for a decision that postdates the actual decision is necessarily illegitimate. *Burton*, 798 F.3d at 238 (citing *Patrick v. Ridge*, 394 F.3d 311, 318 (5th Cir. 2004)). The trier of fact may infer discrimination strictly from the falsity of an employer's explanation. *Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). As the Supreme Court said long ago, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may . . . suffice to show intentional discrimination." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

The stories Defendant told Havins at his termination meeting, to the EEOC, and to this Court are inconsistent and disingenuous. Defendant told Havins he was being terminated due to position elimination. Havins Depo., p. 168. To the EEOC, Defendant said it selected Havins for termination because he scored lowest on a specific measured evaluation, i.e., the Critical Skills Assessment. Position Statement at 2. It said the same thing in its response to the Court's required protocols for employment cases. Exhibit 7, p. 2. Its corporate representative testified that it was only the Critical Skills Assessment that drove the decision. Klingensmith Depo., pp. 110-11. In other words, Defendant says it prepared the Critical Skills Assessment, saw who finished last, and then picked that person. According to Defendant, October 10, 2017 was the day in which it selected Havins for termination. Doc. 45 at 15; Klingensmith Depo., p. 275;

White Depo. II, p. 16. Yet none of this is true.

First, during the deposition of Klingensmith as FMC's corporate representative, Defendant's story and timeline began to unravel. It was then that Klingensmith was forced to confront her own email telling McGee to "start the CSA" one day after FMC says it made the decision to fire Havins (i.e., based on a Critical Skills Assessment it had not even started preparing yet). Exhibit 14. Klingensmith's own email recites that they had already decided to fire Havins, and Klingensmith had to admit that they did not start preparing the Critical Skills Assessment until *after* the decision to file Havins had been made:

> Q.  Was the critical skills assessment created before or after the October 10th meeting?
>
> A.  **After.**

Klingensmith Depo., p. 276 (cleaned up) (emphasis added).

This is just like what happened in *Burton*, 798 F.3d at 222. There, Freescale terminated Burton, supposedly for poor performance. *Burton,* 798 F.3d at 233. The termination occurred in July, but the decision to terminate Burton was made in late June. *Id.* at 226. In its Position Statement, Freescale listed four reasons for Burton's termination, three of which postdated the termination decision. *Id.* at 238. As a matter of law, though, "a purported reason for a decision that postdates the actual decision is necessarily illegitimate." *Id.* "This is true as a matter of law but also as a matter of common sense." *Id.* Why? Because "[a] jury would be entitled to find the defendants' proffer to the EEOC disingenuous and evidence of pretext." *Id.*

As in *Burton*, FMC subsequently attempted to rehabilitate its testimony by amending its interrogatory answers and responses to the Court's Initial Protocols, now claiming that Havins' termination resulted from his bottom of the barrel ranking on what it started calling the "critical skills assessment top grade" (also at times referred to as "Top Grade" or "Top Grade Score").[14]

---

[14]Defendant admits the Critical Skills Assessment and Top Grade spreadsheet are not identical and are two

Defendant's Amended Interrogatories, Nos. 6, 9, 11; Exhibit 18, Defendant's Amended Answers to Initial Protocol's Information Request at 3-4.; Doc. 45 at 8, 15. Nowhere in its Position Statement, original interrogatory answers, initial protocol responses or even the RIF Packet does Defendant ever mention "top grade" scores, let alone conflate that separate employee evaluation process with the Critical Skills Analysis it has been crowing about since March 2018. *See generally* Position Statement, Interrogatory Answers, and Initial Protocols. Yet a section-heading in FMC's summary judgment motion now trumpets that its selection of Havins "was based entirely on Top Grade scores/ranking." Docket Entry No. 45, p. 14.

The truth is, after realizing it had been caught in a lie, Defendant decided on a nomenclature change in the apparent hopes that neither Plaintiff nor this Court would notice. No longer would the allegedly key decisional document be called the "Critical Skills Assessment", as it swore in its Interrogatory Answers and said in its court-ordered protocol responses. Defendant's Amended Interrogatories, Nos. 6, 9 and 11; Amended Protocols at 3-4. Instead, it would refer to them as the "critical skills assessment Top Grade Score", Docket Entry No. 45, p. 15, blithely ignoring Klingensmith's testimony that these were two completely different things. The inconsistency not only casts doubt on Defendant's asserted reasons for terminating Havins, but this shameless, mid-litigation blending of two distinct evaluation processes precisely is the sort of "suspicion of mendacity" that points directly at discriminatory intent. See *St. Mary's Honor Center*, 509 U.S. at 511.

Ultimately, the summary judgment motion's excuse is fundamentally at odds with everything it claimed before. It now says that at the October 10 meeting "Plaintiff was determined to have the lowest measured evaluation ranking (Top Grade Score), a score of 31. Based solely on this score, he was selected as the Operations Planning employee to be laid off."

---

distinct items. Klingensmith Depo., pp. 146-47.

Docket Entry No. 45, p. 15. So now it is saying that the termination decision was dictated by Top Grade scores done in June 2017.[15] Doc. 45 at 2, 8, and 22. But, again, FMC has been claiming for years that it affirmatively did something – *performed* a Critical Skills Assessment – to determine who would be fired. It says so explicitly in the RIF Packet and the interrogatory answers. RIF Packet, Form 1; Defendant's Interrogatory, Nos. 6, 11. Yet now it says the results really were dictated by some months-old assessment of Havins conducted by someone he was reporting to before he began working for Janet Lee. Klingensmith Depo., p. 173. In other words, Defendant now says it did not actually perform anything in October 2017.

Going further, Defendant did not just say it conducted a Critical Skills Analysis that dictated its decision. It claims to have conducted a measured evaluation considering criteria of experience, potential, tenure and performance. Position Statement at 2; Initial Protocols at 3. Yet Defendant's corporate representative admits that none of those criteria were factors used in the evaluation. Klingensmith Depo., pp. 73-74. Defendant also admitted that "relevant experience" – an employee's total years at FMC (i.e. tenure or longevity) – was entirely subjective, based only on individual line manager's knowledge, and therefore not considered when selecting the RIF candidate.[16] Klingensmith Depo., pp. 94-95 and 206.[17] Defendant also admitted that despite the inclusion of employees with less tenure than Havins in the Critical Skills Assessment, *none* were reduced. *Id.* at 96. Forty percent (19 out of 48) of the retained employees included in the Critical Skills Assessment – all of them younger than Havins – had less years of service than him, yet each was retained. RIF Packet, Form 7. Twenty-three other Planner IIIs were retained,

[15]Havins' former manager, Brandy Peacock, scored on ranked him in June. Klingensmith Depo., p. 173. Havins had only been on her team for approximately a month and a half. Exhibit 19.

[16] "Relevant Experience" is not even a category on the Critical Skills Assessment. RIF Packet, Form 4.

[17]This is essentially Schrödinger's legitimate, non-discriminatory excuse, with Defendant insisting simultaneously that it considered and did not consider tenure. Viewed in the light most favorable to Havins, of course, the jury could conclude that that was just one more misrepresentation to the EEOC.

21 of whom were younger than 40. *Id.* All of these false statements serve to create fact issues precluding summary judgment.

Defendant tries to lessen the blow of its false statements to the EEOC by claiming that "Plaintiff quibbles with the words TFMC used in its EEOC Response." Doc. 45 at 15. Freescale Semiconductor tried that gambit, too, but the Fifth Circuit rejected it as "dismissive bluster" that was not "compelling in the slightest." *Burton*, 798 F.3d at 239 n.16. This Court should, too.

### C. No Critical Skills Assessment Was Actually Performed.

FMC claims to have done an assessment on the merits of all the workers in White's organization, leading to Havins' selection on the merits. But viewed in the light most favorable to Havins, no such assessment ever occurred.

Lee was Havins' immediate supervisor at the time and thus in the best position to assess his performance. She said that his performance was good and she was happy to have him on the team. She had only just assigned him to work on a critical project. But Lee testified that she had no role in the assessment process. The same is true with respect to White. He says he had no role assessing employees, that Klingensmith came into the October 10 meeting with an assessment already completed, and that she dictated that Havins would be fired. If Havins' immediate and next-level supervisors had no role assessing Havins, then a reasonable factfinder could conclude that no 'measured evaluation' process ever actually occurred.

FMC has also insisted that Lee prepared the RIF Packet, which includes the Critical Skills Assessment. But Lee says this is a lie and, in fact, that she never saw the RIF Packet until her deposition. Klingensmith, of course, admitted forging Lee's name as having prepared the document before adding her own as having "Reviewed and Approved". Viewed in the light most favorable to Havins, the jury could conclude that FMC conducted no 'measured evaluation' of Havins before his firing. This conclusion is certainly bolstered by the fact that Klingensmith had

to falsify the RIF Packet's preparation and approval.

**D.**     **Klingensmith Is an "Interested Witness," Her Credibility is in Tatters, and a Reasonable Factfinder Could Disbelieve Everything She Has to Say.**

A court should give credence to evidence favorable to the nonmovant and uncontradicted and unimpeached evidence favoring the moving party, *at least to the extent that the evidence comes from a disinterested witness*. *Reeves*, 530 U.S. at 150-51 (italics added).  The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.*

Defendant's motion relies solely on the Affidavit of Noreen Klingensmith. Doc. 45, Exhibit A. Deciding whether she is telling the truth is a task for the jury, and there is just no reason here to think that any juror would believe what she has to say.  *Reeves*, 530 U.S. at 150.

Klingensmith has lied repeatedly.  She lied about Lee and White's RIF involvement in the interrogatory answers she verified. Interrogatory Answers, Nos. 4, 11; Klingensmith Depo., pp. 181-83; White Depo., pp. 136-38; Lee Depo., pp. 76, 79. She literally forged Lee's name on the RIF Packet. Klingensmith Depo., pp. 181-83. She misrepresented her own involvement in the RIF. Klingensmith Depo., pp. 153-54; Defendant's Amended Interrogatories, No. 4. Who knows what, if anything she said, is truthful and reliable?[18] Based on all these falsities, a juror would understandably be entitled to disregard anything Klingensmith has to say.

**E.**     **Defendant's Numerous Lies May Be Taken as Affirmative Evidence of Guilt.**

A factfinder may consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Reeves,* 530 U.S. at 147. Defendant's bucket of lies here permits a reasonable factfinder to conclude that Havins was fired because of his age.

---

[18]If the Court determines that credibility concerns foreclose any reliance on Klingensmith's Affidavit, then Defendant's entire summary judgment motion must fail because there would then be no evidence in the record to meet FMC's burden of producing evidence of an excuse. *St. Mary's Honor Ctr.*, 509 U.S. at 506-07); *Texas Dep't of Community. Affairs v. Burdine*, 450 U.S. 248, 255, 255 n.9 ("An articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel.").

Defendant has lied extensively about the RIF selection process, as detailed above. The summary judgment record, though, shows that it picked Havins first and then compiled its justification. Defendant lied about management's involvement in the RIF process. It falsely claims White ran the show and Lee prepared the paperwork. Klingensmith admits forging Lee's name on the RIF Packet. For years Defendant insisted the Critical Skills Assessment cost Havins his job. But now it says that the most recent Top Grade Scores[19] dictated the result, though there are actually numerous unexplained differences between the two.[20] By way of example, in June, the individual and final scores of Havins and Valerie Thompson were identical. Exhibit 20. Remember, Klingensmith, White and Lee testified that no changes to the June spreadsheet were made in October. Yet, inexplicably, Thompson's score on "job knowledge" and "technical and problem solving skills" increased by one point each. *Compare* Exhibit 20 with Exhibit 17. This increased Thompson's final score by four points, while Havins' remained at 31. Exhibit 17. Without these manipulations, Thompson too – or perhaps instead of Havins – would have been on the chopping block.[21]

---

[19]This is especially concerning given that on the June 2017 top grade spreadsheet, White removed Havins from the rankings. White was particularly concerned about bias and Peacock not having enough information to accurately grade him or give him an objectively balanced score given his short tenure on her team. White Depo., pp. 49-50.

[20]Significant differences exist between the June and October Top Grade Spreadsheets. For example, the June version only includes employees in the planning department. It does not include Miller's rental and asset tool team. Fourteen employees appear on the October spreadsheet that were not included on the June one. Many employees appearing on both have different managers and pay grades in October than in June. Most importantly, in October, at least twenty employees have different individual and final scores than in June. This is baffling considering Klingensmith, White and Lee recall no changes made to the spreadsheet in October. These unaccounted-for changes add to the unreliability of FMC's entire process used to rationalize Havins' termination.

[21]The subjectivity of the scoring and ranking also calls the whole process into question. The collaborative meetings during which management discussed employee performance and selected RIF candidates were nothing more than a group of managers saying, without rhyme or reason, "I place this person as one and this person as zero or two." White Depo. II, p. 86. Scores are based solely on managers' feelings rather than objective metrics. *Id.* at 84-85; Klingensmith Depo., p. 206. The accuracy of an employee's score cannot be independently verified as there is no documentation detailing an employee's abilities. Klingensmith Depo., pp. 228, 232. The excessively subjective nature of the assessments therefore demand close scrutiny because they provide "a ready mechanism for discrimination." *Shafer v. Commander, Army & Air Force Exchange Service*, 667 F. Supp. 414, 430-21 (N. D. Tex. 1985). Such subjective assessments, in fact, will sometimes not even satisfy an employer's burden of production

Defendant also lied about not replacing Havins and the October 4 Powerpoint indicates that FMC decided to replace Havins with a much younger employee long before it supposedly conducted its 'measured evaluation'. Klingensmith Depo., pp. 199-200; White Depo., pp. 116-17; *see* Exhibit 16. This, too, is evidence of pretext. *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 387-88 (5th Cir. 2003).

This case is quite similar to *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129 (2nd Cir. 2000), also an age case arising out of a reduction in force, where the Second Circuit found triable issues of material fact. Importantly, it found probative of age discrimination the fact that following Carlton's termination "his duties were transferred in part to Gounalis, a co-worker, who was 18 years younger than Carlton, and his remaining duties were given to Oravets, an employee 25 years younger, who was hired three months after Carlton was discharged." *Id.* at 135-36. While FMC posits that the reduction in force reduced the planning group's headcount by one, it still needed to cover Havins' duties by assigning them to substantially younger workers, one of whom had to be transferred from *outside* the organization in order to do so. *Carlton* found that a fact like this "tended to refute the reduction-in-force reason for plaintiff's discharge." *Id.* at 136. It also found, like here, that the employer changed its explanation between the EEOC and the courthouse. *Id.* at 137.

Defendant's misrepresentations about Havins' termination are varied and many. It cannot keep its story straight and when challenged with evidence of its lies it simply changed its story and gamely told this Court that there are no triable issues of material fact. This is not right. *Goka*, 862 F.2d at 650. Since the jury could divine discrimination from these numerous falsehoods, summary judgment must be denied.

---

"because they do not allow reasonable opportunity to rebut." *Lee v. Russell County Bd. of Ed.*, 684 F.2d 769, 775-76 (11th Cir. 1982).

### F.      Robert White Says Havins Was Fired Because of His Age.

FMC identified Robert White as a key decisionmakers.  But White not only denies having had any involvement in the termination, but he says i) there was no substantive integrity to the company's selection of Havins for termination; and 2) the company fired Havins because of his age and for no other reason.  White Depo. II, p. 80 and 100.

White also puts the spotlight on a widely known philosophy at FMC that workers with tenure are considered "old culture." White Depo. II, p. 92. As the oldest planner in his unit, Havins' termination exemplifies Defendant's overarching company culture – terminating older, more experienced (and expensive) employees while retaining or hiring younger, less experienced (and cheaper) employees.[22] *See id.* at 10. In fact, just before the October RIF, 27 year old Taylor Bacon, a Project Planner III like Havins, was allowed to transfer out of White's department to avoid the RIF.  *Id.* at 71; Havins Depo., pp. 179-80; Exhibit 16, FMC 532. Havins was never given this opportunity.

Plaintiffs rarely obtain testimony from the company supporting a claim of discrimination. It is rarer still when it comes from a witness who the employer says played a critical role in the termination.  All evidence must be viewed in the light most favorable to Havins.  FMC places White at the center of the storm and White says the firing was age-based.  Summary judgment should be denied.

### G.      *McMichael* is Distinguishable.

Defendant tries to align this case with *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447 (5th Cir. 2019), probably because it is a RIF case and it involved a "high grade" exercise, similar to FMC's eleventh-hour, litigation-driven adoption of the "Critical Skills analysis top grade" phrasing.  But *McMichael* is not even remotely instructive.

---

[22]White confirmed that Havins' allegations to this effect are accurate.  White Depo. II, pp. 18-19.

In *McMichael*, Transocean included the plaintiff in a broad reduction in force, one that cost nearly 1,000 employees their jobs. That contrasts with this case in which the entire RIF led to the termination of just one person – Havins.

The pretext arguments discussed in *McMichael* are entirely different than those in this case. Specifically, McMichael argued that he had evidence of pretext because of discriminatory comments, that a less qualified person replaced him, and because the company departed from procedure. Havins, by contrast, argues that the chronology does not match up, that internal documents undercut the excuse, that FMC has lied repeatedly about what happened, who was involved and what they did, and that its story has changed materially over time, etc.

Most critically, Defendant cites *McMichael* for the proposition that a RIF on its own can be a legitimate, non-discriminatory excuse. Docket Entry No. 45, p. 21. "Even within the context of a legitimate reduction-in-force, however, an employer may not discharge an employee 'because' of his age." *Carlton*, 202 F.3d at 136. And even if a company saying 'we had a RIF' did meet its burden of articulating a legitimate, nondiscriminatory excuse, that is *not* what FMC has argued here. FMC says 'we had a RIF, so we performed a Critical Skills Analysis, and it dictated who would get the axe.' It says it prepared that analysis, saw who finished last, and picked that person. But the summary judgment record here shows that to be false.

Further, the facts were completely different in *McMichael*. Here, FMC terminated just one employee from the operations department while retaining 23 other Planner III's, 21 of whom were younger than 40. In *McMichael*, by contrast, Transocean fired every toolpusher but one who worked on McMichael's rig. *McMichael*, 934 F.3d at 461. Here, FMC now claims to have used old scores from a regular semi-annual evaluation process done months before by former managers, whereas in *McMichael* the company used an evaluation process specifically "devised and implemented" for use in the RIF. *Id.* at 453. McMichael's current manager actually

performed the ranking and scored all five employees on his team. *Id.* at 454. Here, neither Lee nor White played any role in the ranking process that supposedly occurred. And importantly, the process in *McMichael* compared toolpushers to toolpushers, whereas in this case they were comparing Planner III's to Planner II's to Project Manager, and so on. *See* Klingensmith Depo., pp. 99, 141-42.

In short, *McMichael* has nothing to do with the record presented here. The circumstances there were entirely different, involving a broadly-sweeping reduction in force and pretext arguments nothing like what Havins argues here.

<u>CONCLUSION</u>

FMC concedes that Havins can demonstrate a prima facie case of age discrimination, meaning that the sole summary judgment issue presented is whether the record contains proof of pretext. The pretext evidence here is overwhelming. Summary judgment must be denied.

Respectfully submitted,

DOW GOLUB REMELS & GILBREATH, PLLC

*/s/ Alexandra M. Wolf*
Andrew S. Golub
Attorney-In-Charge
asgolub@dowgolub.com
S.D. Tex. No. 13812
Texas Bar No. 08114950
Alexandra M. Wolf
awolf@dowgolub.com
S.D. Tex. No. 3159449
Texas Bar No. 24089226
2700 Post Oak Blvd., Suite 1750
Houston, Texas 77056
Telephone: (713) 526-3700
Facsimile: (713) 526-3750

ATTORNEYS FOR PLAINTIFF